UNITED STATES FIRE INSURANCE
COMPANY,

        Plaintiff,

v.                                          Case No. 09-12362

POLESTAR CONSTRUCTION
OF FLORIDA, LLC, et al.

        Defendants.

                                          /

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the court is a "Motion for Summary Judgment," filed on February 12, 2010, by Plaintiff United States Fire Insurance Company. A response was filed on March 15, 2010 and a reply on March 22, 2010. After the briefing was completed, it was determined that this case was a companion to case no. 08-12834, and the case was reassigned to this court. *See* E.D. Mich. LR 83.11(b)(7). A hearing on this motion is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will grant in part and deny in part Plaintiff's motion.

## I. INTRODUCTION

In a prior case before this court, Plaintiff sued Defendant Polestar Construction of Florida, LLC ("Polestar Florida") for breach of contract and account stated. (Case No. 08-12834, 7/2/08 Compl.) The suit was based on Polestar Florida's failure to pay premiums due on a worker's compensation and employers' liability insurance policy. (*Id.* ¶ 5.) The parties stipulated to the entry of a Consent Judgment in favor of Plaintiff

and against Polestar Florida in the amount of $231,018.00, and the court entered the Consent Judgment on September 25, 2009.  (9/25/09 Consent Judgment.)  The judgment remains unsatisfied, despite Plaintiff's efforts to collect, because Polestar Florida has no assets.  (Pl.'s Mot. Br. at 3.)

On June 18, 2009, Plaintiff initiated the present case by filing a five-count "Complaint for Proceedings Supplementary to Judgment" against Defendants Polestar Florida, Polestar Construction of Michigan, LLC, Polestar Construction, LLC, Four Star Holdings, LLC, Yukon Holdings, LLC, Aaron Banach Enterprises, Inc., Aaron Banach, Anita Banach, Daniel Gilbert, and Amy Gilbert.  (6/18/09 Compl.)  Plaintiff is seeking to collect the unpaid prior judgment against these various entities and individuals that have some connection to Polestar Florida.  (*Id.*)  At the beginning of discovery, Defendants filed a third-party complaint against Kevin Rafferty and Timothy Morrison, who are members of Polestar Florida.  (9/4/09 Third-Party Compl.)  On February 12, 2010, Plaintiff filed the present motion for summary judgment based on the theory that Polestar Florida's corporate veil should be pierced.

## II.  BACKGROUND

### A.  The Parties

Plaintiff United States Fire Insurance Company is a Delaware corporation with its principal place of business in New Jersey.  (Compl. ¶ 1.)  It is a nationwide insurance company.  (Pl.'s Mot. Br. at 4.)

Defendant Polestar Florida is a Florida limited liability company in the business of concrete restoration and hurricane glass.  (Compl. ¶ 1; Pl's Mot. Ex. A at 12.)  It has four members: Defendant Aaron Banach ("Banach"), Defendant Daniel Gilbert

("Gilbert"), Third-Party Defendant Kevin Rafferty ("Rafferty"), and Third-Party Defendant Timothy Morrison ("Morrison").  (Compl. ¶ 11.)  Banach and Gilbert are the managing members of Polestar Florida, and according to Morrison and Rafferty, "were in sole control of all business decisions and actions taken by Polestar Construction of Florida, LLC."  (Pl.'s Mot. Ex. C, ¶ 4.)  Polestar Florida was formed in approximately January of 2005.  (Compl. ¶ 26.)  It had no initial capitalization; the four members merely brought their knowledge and contacts.  (Pl.'s Mot. Ex. A at 38-39.)  Banach described Polestar Florida initially as "nothing more than the four of us."  (*Id.* at 39.)  The business was funded by its projects, which often made payments up front.  (*Id.*)

Defendant Four Star Holdings, LLC ("Four Star Holdings") is a real estate holding company that consists of the same four members of Polestar Florida.  (*Id.* at 112.)  It was organized to purchase an office building in Hollywood, Florida, and it also briefly held two pre-construction condo units.  (*Id.*)

Banach and Gilbert are the sole members of Defendants Polestar Construction of Michigan, LLC and Polestar Construction, LLC.  (*Id.* at 8.)  Polestar Construction, LLC did not perform any work and it shared the same tax identification number as Polestar Construction of Michigan, LLC.  (*Id.*)  The court will therefore refer to these entities collectively as "Polestar Michigan."  Polestar Michigan's business focuses on apartment complex maintenance and renovation in Michigan.  (*Id.* at 12.)

Banach and Gilbert are also the sole members of Defendant Yukon Holdings, LLC ("Yukon Holdings").  (*Id.* at 9.)  Yukon Holdings purchased a house in Stuart, Florida.  (*Id.* at 124.)

Defendant Anita Banach is married to Aaron Banach, and Defendant Amy Gilbert is married to Daniel Gilbert. (Compl. ¶¶ 44-48.) Plaintiff alleges that it was these four individuals that purchased the house in Stuart, Florida, not Yukon Holdings. (*Id.*)

Defendant Aaron Banach Enterprises, Inc. is a corporation that was originally established as Color Works Collegiate Painters, but it has filed a d/b/a as Polestar Construction. (Pl.'s Mot. Ex. A at 67.) The company does not have any present operations. (*Id.*)

### B. The Failed Florida Condo Projects

The main reason Polestar Florida was formed was to perform work on two condominium conversion projects for a large developer, KMC. (*Id.* at 15.) The projects, "Treasures on the Bay" and "401 Blue," were located in Miami, and Polestar Florida was the main contractor. (*Id.* at 15, 18.) These two projects came into being near the end of the real estate boom in Miami, and the developer eventually went out of business and lost the properties. (*Id.* at 15, 24.) In 2006, Polestar Florida lost approximately one million dollars on these projects. (*Id.* at 19, 30-31.) At his deposition, Banach stated that Polestar Florida would have probably survived if it had not been for those two projects. (*Id.* at 75.)

### C. Plaintiff's Audit

Plaintiff issued a workers compensation insurance and employer liability policy to Polestar Florida. (Pl.'s Mot. Br. at 4.) After the expiration of the policy, Plaintiff performed a workers compensation audit. (Compl. ¶ 14; Pl.'s Mot. Ex. A at 32.) The audit revealed that Polestar Florida owed $289,680 in additional premiums. (Pl.'s Mot.

Ex. A at 32.)  Polestar Florida "endeavored to pay Plaintiff" and made payments of $61,042 towards these additional premiums, but then it ceased making payments. (Defs.' Resp. Ex. 1 ¶ 5.)  The balance is the basis of the present dispute.

### D.  Polestar Florida's Operations

Most of Polestar Florida's administrative work was performed at an office in Michigan, where Gilbert and Banach worked along with their bookkeeper, Wanda Brown.  (Pl.'s Mot. Ex. A at 37.)  This office was used for both Polestar Florida and Polestar Michigan, with the employees for Polestar Michigan doing bookkeeping, answering telephone calls, performing information technology work, and estimating for Polestar Florida.  (*Id.* at 148.)  Polestar Florida would pay Polestar Michigan to cover these functions that Polestar Michigan performed on its behalf.  (*Id.* at 149.)  A total amount of overhead was calculated for the office, and then the amount paid by Polestar Florida to Polestar Michigan would be based on a percentage of what the total sales were that month for each entity.  (*Id.*)  This was the method used for allocating overhead expenses in 2006 and 2007, but Banach was unsure of the method used in 2005.  (*Id.* at 150.)  Regarding production functions and information technology work, Polestar Florida would pay Polestar Michigan for the actual hours worked.  (*Id.* at 149.)  Morrison and Rafferty, as well as project managers and estimators, worked in an office in Florida. (*Id.* at 37.)

Polestar Florida employed persons in Michigan and Florida.  (*Id.* at 68-69.) Polestar Michigan had a large number of employees in Florida performing work at the 401 Blue project for Polestar Florida.  (*Id.* at 160.)  It was Polestar Michigan that paid these employees because, according to Banach, "they were Michigan residents paying

taxes in the State of Michigan." (*Id.*) Polestar Florida would then make large payments to Polestar Michigan to cover the payroll costs that Polestar Michigan was incurring by its employees working on Polestar Florida's project. (*Id.* at 161.) These hundreds of thousands of dollars going between Polestar Florida and Polestar Michigan are evinced by Plaintiff's Exhibit D, which is a compilation of various checks drawn from Polestar Florida's accounts. (*Id.* at 158-160.) Banach was unsure how these transactions were documented within the company and stated, "There's some documentation in some form that tells both entities what the money is for going back and forth. What it is and where it is, I don't know." (*Id.* at 162.)

### E. Intercompany Loans from Polestar Florida

### 1. Polestar Michigan and Payroll Loans

Polestar Florida and Polestar Michigan made a series of intercompany loans, typically to cover payroll expenses. (*Id.* at 62.) In the 2005 financial statements, there was an intercompany loan for $181,000, and in the 2006 financial statements, there was an intercompany loan for $196,000. (*Id.* at 98-99.) Banach explained these entries as follows: "That would be money from either the Michigan entity or Florida entity going back and forth to help cover payroll, payroll taxes. Typically that's what that money was, covering payroll or payroll taxes." (*Id.* at 99.) Banach later clarified that the $181,000 loan was a loan to Polestar Michigan from Polestar Florida. (*Id.* at 132.) He explained the reason for the loans was that "there was money that went back and forth to keep things afloat between both entities. It wasn't a matter of favorable preference between entities. It was a matter of staying in business." (*Id.* at 134.) Banach stated, "And it would go both ways, too. Michigan would send money back to Florida at times

to cover payroll, payroll taxes, IRS payments.  Both entities helped each other out in times of need." (*Id.* at 155.)  As an example, in February of 2005, $102,000 was transferred between Polestar Florida and Polestar Michigan, and in April of 2005, over $200,000 was transferred between Polestar Florida and Polestar Michigan.  (*Id.* at 152, 154.)

### 2.  Four Star Holdings, LLC and the Purchase of the Office Building

Four Star Holdings was set up to purchase an office building in Hollywood, Florida.  (*Id.* at 112)  It also briefly held two pre-construction condo units at one of its projects, but these units were eventually sold for a loss.  (*Id.* at 112, 123.)  The office building was purchased for approximately $695,000.  (*Id.* at 95.)  As no capital contributions were made to Four Star Holdings, the purchase of the building was financed with a loan from a private lender as well as a loan from Polestar Florida for $100,190.  (*Id.* at 114-15.)  The loan from Polestar Florida was documented with a promissory note, and at the end of 2006, the amount Four Star Holdings owed to Polestar Florida was approximately $45,000.  (*Id.* at 120, 124.)

Polestar Florida occupied the office building and made rent payments to Four Star Holdings.  (*Id.* at 118, 123.)  The office building was sold on November 28, 2006, for a gain of $110,000, with each of the four owners receiving $10,000 from the sale. (*Id.* at 120.)

### 3.  Yukon Holdings, LLC and the Purchase of the Stuart, Florida House

In 2005, Polestar Florida loaned Yukon Holdings $138,000 that was used for the purchase of a house in Stuart, Florida.  (*Id.* at 96, 124, 126.)  This loan was documented with a promissory note.  (*Id.* at 124.)  The precise purchase price is unclear, but the

basis used for depreciation in 2005 was $629,923.  (*Id.* at 126.)  In addition to the loan

from Polestar Florida, Yukon Holdings obtained a loan from Countrywide Financial.  (*Id.*

at 131.)  As of February 19, 2009, the balance of the mortgage was $590,000.  (*Id.* at

129.)

When asked why Polestar Florida was loaning money when it was showing a

loss for 2005, Banach replied, "They had no business loaning money."  (*Id.* at 96.)  By

the end of 2006, the amount of the debt was $138,289.  (*Id.* at 97.)  Banach stated that

to the best of his knowledge, this note receivable has been paid.  (*Id.* at 98.)  However,

on a January 16, 2009 garnishee disclosure, Yukon Holdings indicated that it was

indebted to Polestar Florida in the amount of $64,888.90, but that it was exempt from

withholding because it assumed IRS debt in the same amount as the indebtedness to

Polestar Florida.  (Pl.'s Mot. Ex. F.)  A March 2010 affidavit from Banach states that "the

loan to Yukon Holdings, LLC was repaid to Polestar Construction of Florida, LLC in full

and with interest."  (Defs.' Resp. Ex. 1, ¶ 7.)

The house was on the market for a few years, and was originally listed for around

$900,000, although it is presently being used as a rental and is not currently for sale.

(Pl.'s Mot. Ex. A at 125, 127, 129-30.)  Banach stated that he does not know what the

present equity in the house is, but that it is "upside down."  (*Id.* at 130.)

### F.  Financial Performance and Executive Compensation

#### 1. Polestar Florida

In 2005, Polestar Florida had approximately $11 million in sales, but it reported a

loss of $173,896.  (*Id.* at 86-87.)  Gilbert and Banach reported losses of $45,212, and

Morrison and Rafferty reported losses of $41,735.  (*Id.* at 87.)  Banach had a capital

contribution balance of $0.00, Gilbert had a balance of $84,811.86, Morrison had a balance of $3,543.00, and Rafferty had a balance of $0.00. (*Id.* at 40.) The reason Gilbert's capital contribution balance was larger than the others in 2005 was because he loaned Polestar Florida money to cover payroll. (*Id.* at 41.)

The compensation of officers for 2005 was $194,000 and was split between the four members. (*Id.* at 87-88.) This amount represented the members' salary as employees of the limited liability company. (*Id.* at 88.) The compensation was based on guidelines from their accountant taking into account tax considerations and the amount other persons were paid performing a similar line of work. (*Id.* at 141.)

At his deposition, Banach explained how cash-flow affected their officer distributions, "If there was money there that was available, then, yes, we would take a distribution, and if money wasn't there for a payroll, we wouldn't take a payroll check . . . . I wouldn't say that we – if there was a positive cash flow that we were sweeping everything out of the company, but we would take distributions based on how much money was available at the time and what our receivables were and what bills we had coming up . . . ." (*Id.* at 142.) In a March 2010 affidavit, Banach stated that "[c]ompensation paid by Polestar Construction of Florida, LLC decreased and eventually ceased when Polestar Construction of Florida, LLC began to experience cash flow problems." (Defs.' Resp. Ex. 1, ¶ 6.)

Banach and Gilbert received their salaries from Polestar Florida through Polestar Michigan in order to save money on FICA tax. (Pl.'s Mot. Ex. A at 103.) Polestar Florida would pay a "management fee" to Polestar Michigan in the amount of their salaries and then Polestar Michigan would pay this amount to Banach and Gilbert. (*Id.*)

This allowed them to avoid paying FICA tax twice since they were already making a salary from Polestar Michigan.  (*Id.*)

In 2006, Polestar Florida had gross sales of $4,542,545, and posted a profit of $332,443.  (*Id.* at 91.)  Gilbert and Banach reported ordinary business income of $86,435 and Morrison and Rafferty reported ordinary business income of approximately $80,000.  (*Id.* at 93-94.)  Compensation of officers was down this year to $93,400.  (*Id.* at 92.)  At the end of 2006, Banach had a capital contribution balance of $0.42, Gilbert had a balance of $871.17, Morrison had a balance of $0.00, and Rafferty had a balance of $13,799.96.  (*Id.* at 40.)  Balance sheets were not prepared for 2007 and 2008.  (*Id.* at 41.)

### 2.  Polestar Michigan

In 2005, Polestar Michigan had sales of $2,498,598, but it reported a loss of $427,502.  (*Id.* at 131-32.)  The compensation for its officers, Banach and Gilbert, was $258,858.  (*Id.* at 132.)  Banach noted that these figures are based on Polestar Michigan's tax return, which he described as a "snapshot of the year," and that he and Gilbert were not taking distributions and paychecks later in 2005 after "getting kicked below the belt," referring to the failed condo projects in Florida.  (*Id.* at 133.)  Banach stated that at the same time Polestar Florida was losing money at the 401 Blue project and the Treasures project, Polestar Michigan lost approximately $300,000 on a large condo project in Florida called Ocean View Towers.  (*Id.* at 134-35.)  Thus, according to Banach, they "got kicked in both companies [at] approximately the same time, which is the same time the problems with the IRS started."  (*Id.* at 135.)

Polestar Michigan was involved in litigation arising out of the Ocean View Towers

project.  (*Id.* at 136.)  It received a settlement for $200,000; however, it had $200,000 in legal fees.  (*Id.*)  Approximately $40,000 to $50,000 of these legal fees were paid by Polestar Florida.  (*Id.* at 136, 139.)  Banach stated, "This is part of both entities trying to keep a heart beat in both," but he also explained that someone in the office in Michigan posted the legal invoices to the wrong company.  (*Id.* at 136, 144.)  Banach testified that Polestar Michigan paid the $40,000 in legal fees back to Polestar Florida by making payments on debts that Polestar Florida owed to the IRS, credit card companies, and other creditors.  (*Id.* at 146.)

### G.  Polestar Florida Winds Up

Polestar Florida's last business operations were in December of 2007.  (*Id.* at 42.)  Morrison had stopped participating in Polestar Florida in 2006, and Rafferty had stopped in 2007, although there is no indication that either are no longer formally members of Polestar Florida.  (*Id.* at 15.)

On May 13, 2008, Polestar Florida conducted its annual member meeting, with Banach, Gilbert, and Rafferty present.  (Pl.'s Mot. Ex. E, 5/13/08 Meeting Minutes, ¶ 2.) The members reviewed the current jobs and noted that "[a]ll work had been completed using employees from Michigan to complete all unfinished work."  (*Id.* ¶ 6)  The members also noted that "[n]o new work was being bid or produced t[h]rough Polestar Construction of Florida, LLC."  (*Id.*)  The members expressed concern "how the liabilities would be met after all Polestar Construction of Florida, LLC work had been completed and paid for" and stated that "[t]otal liability had been reduced from $986,836.04 to $430,825.31 since Kevin resigned on 11/10/2007."  (*Id.* ¶ 7.)  The members reviewed a "reduction of liabilities," which detailed "the loan to Yukon Holdings

LLC, Polestar Construction of Michigan, LLC and legal fees that were accidentally posted to Polestar Construction of Florida, LLC." (*Id.* ¶ 9.) Gilbert moved for a capital call, which was seconded by Banach. (*Id.* ¶ 11.) "The capital call asked for each member to contribute financially to cover the monthly financial commitments of Polestar Construction of Florida, LLC. . . . Payments are to be made by the 25th of each month beginning July 25, 2008." (*Id.*) At a member meeting held on May 27, 2008, Banach and Gilbert noted that Rafferty did not make his first payment toward the capital call and that he was in default. (Pl.'s Mot. Ex. E, 5/27/08 Meeting Minutes, ¶¶ 1, 2.)

Polestar Florida had approximately $27,000 in credit card debt. (Pl.'s Mot. Ex. A at 49.) Banach and Gilbert are making payments on these accounts because they signed personal guaranties. (*Id.* at 48.) As of February 19, 2009, one of the balances has been paid in full and another transferred to Polestar Michigan, which is now making payments. (*Id.* at 173.)

Polestar Florida also presently owes more than $200,000 to the Internal Revenue Service ("IRS"). (*Id.* at 44.) A payment plan has been established in which Banach and Gilbert make monthly payments of $10,133. (*Id.* at 44-45.) They are making these payments because individual members of a limited liability company are personally responsible for 941 withholding tax. (*Id.* at 45.)

Banach and Gilbert determined that the payment agreement cannot go into default because they do not want to be held personally liable. (Pl.'s Mot. Ex E, 5/27/08 Member Meeting Minutes ¶ 3.) They therefore established the following payment method in order to ensure that the payments to the IRS are made. First, all of Polestar Florida's accounts receivables will go to pay off the IRS debt. (*Id.* ¶ 4.) After the

receivables are exhausted, Polestar Michigan will make payments to the IRS in an amount that equals what it owes Polestar Florida based on the intercompany loans. (*Id.* ¶ 5.) Once Polestar Michigan satisfies its debts to Polestar Florida, Yukon Holdings will make payments to the IRS in an amount that equals what it owes Polestar Florida. (*Id.* ¶ 6.) After the IRS debt is paid, Banach and Gilbert agreed that Polestar Florida would file for bankruptcy. (*Id.* ¶ 9.)

### III. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing' –that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case."

13

*Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325).

The burden then shifts to the nonmoving party, who "must do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must put

forth enough evidence to show that there exists "a genuine issue for trial." *Horton,* 369

F.3d at 909 (citing *Matsushita*, 475 U.S. at 587). Summary judgment is not appropriate

when "the evidence presents a sufficient disagreement to require submission to a jury."

*Anderson*, 477 U.S. at 251-52.

## IV. DISCUSSION

Plaintiff's motion for summary judgment is based on a veil-piercing theory and

asks the court "to collapse the corporations as alter egos and render them all

accountable and liable along with the individuals who controlled them." (Pl.'s Reply at

3.)

An action to pierce the corporate veil is not a separate cause of action. *See In re*

*RCS Engineered Products Co.*, 102 F.3d 223, 226 (6th Cir. 1996). Instead, it is a

remedy that is equitable in nature, *Arevelo v. Arevalo*, Nos. 285548, 286742, 2010 WL

1330636, at *16 (Mich. Ct. App. Apr. 6, 2010), and the party seeking to pierce the

corporate veil bears the burden, *Lipp v. Bruce*, No. 270264, 2007 WL 2935027, at *2

(Mich. Ct. App. Oct. 9, 2007) (citing 1 Fletcher, Cyclopedia Corporations, § 41.28, at

610-11).

The Sixth Circuit has described Michigan law regarding piercing the corporate

veil as follows:

Under Michigan law, there is a presumption that the corporate form will be

14

respected. *Seasword v. Hilti*, 537 N.W.2d 221, 224 (Mich. 1995) (citing *Herman v. Mobile Homes Corp.*, 26 N.W.2d 757, 761 (Mich. 1947)). "This presumption, often called the 'corporate veil,' may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Id.* (alteration in original) (quoting *Wells v. Firestone*, 364 N.W.2d 670, 674 (Mich. 1984)). Michigan courts will not pierce the corporate veil unless (1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss. *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996) (citing *SDC Chem. Distribs., Inc. v. Medley*, 512 N.W.2d 86, 90 (Mich. Ct. App. 1994)); *see also Gledhill v. Fisher & Co.*, 262 N.W. 371, 372 (Mich. 1935). The propriety of piercing the corporate veil is highly dependent on the equities of the situation, and the inquiry tends to be intensively fact-driven. *Kline v. Kline*, 305 N.W.2d 297, 299 (Mich. Ct. App. 1981) (per curiam); *see Herman*, 26 N.W.2d at 761 ("In determining whether the corporate entity should be disregarded and the parent company held liable on the contracts of its subsidiary because the latter served as a mere instrumentality or adjunct of the former, each case is sui generies and must be decided in accordance with its own underlying facts.").

*Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 798-99 (6th Cir. 2007).

Typically, courts have pierced the corporate veil "to protect a corporation's creditors where there is a unity of interest of the stockholders and the corporation and where the stockholders have used the corporate structure in an attempt to avoid legal obligations." *Foodland Distributors*, 559 N.W.2d at 381 (citing *Allstate Ins. Co. v. Citizens Ins. Co. of Am.*, 325 N.W.2d 505 (1982)). "There is no single rule delineating when a corporate entity should be disregarded." *Rymal v. Baergen*, 686 N.W.2d 241, 252 (Mich. Ct. App. 2004). Instead, the "entire spectrum of relevant fact[s]" should be considered, *Foodland Distributors*, 559 N.W.2d at 381, and the facts "assessed in light of a corporation's economic justification to determine if the corporate form has been abused." *Rymal*, 686 N.W.2d at 252.

15

## A. Mere Instrumentality

Plaintiff argues that Banach and Gilbert operated the Defendant companies as a "mere instrumentality" of one another, as evinced by: (1) the "gross undercapitalization" of Polestar Florida; (2) the use of Polestar Florida as a bank to finance the operations of the other entities; (3) the repeated transfer of money between the entities on an as needed basis, (4) the payment of excessive compensation to Banach and Gilbert; (5) the loan to Yukon Holdings for the purchase of a house unrelated to the business of Polestar Florida; (6) the transfer of funds among the various entities for payroll and legal expenses; and (7) the selective repayment of debts in which Banach and Gilbert are personally liable. (Pl.'s Mot. Br. at 16-17.)

Defendants argue that Banach and Gilbert had no intent to operate the businesses as "mere instrumentalities" of each other, as demonstrated by the following facts: (1) the companies kept separate books and records; (2) the companies held corporate meetings, (3) the companies documented intercompany loans; (4) the companies had separate members; and (5) the companies sought to repay their debts, including the debt to Plaintiff, despite an inability to do so because of the timing of their decision to enter the real estate market in Florida. (Defs.' Resp. at 6.)

Michigan courts have not yet articulated clearly-stated factors to be considered when determining what constitutes a "mere instrumentality" for purposes of piercing the corporate veil. *Cf. L & R Homes, Inc. v. Jack Christenson Rochester, Inc.*, 713 N.W.2d 263 (Mich. 2006) (Corrigan, J., dissenting from denial of application for leave to appeal) ("I would grant leave to appeal to articulate clear standards for piercing the corporate veil and settle the confused state of Michigan jurisprudence regarding this problem.").

16

Some factors that have been considered include: whether the companies shared common directors, whether the companies shared an office, and whether meetings were held and minutes kept. *Action Plumbing & Heating Co. v. Jared Builders, Inc.*, 118 N.W.2d 956, 958 (Mich. 1962.)  In the parent-subsidiary context, a Michigan court found the following facts pertinent to the inquiry:

> (1) all of the subsidiaries' capital and credit was provided by the parent; (2) one subsidiary purchased all of its supplies from the parent; (3) one of the subsidiaries was grossly undercapitalized; (4) the directors and officers of the subsidiaries were the officers and directors or employees of the parent company and the sons of the president of the parent company; (5) the parent handled the payroll of one subsidiary; (6) officers and employees of the parent company rendered gratuitous services to the subsidiaries; (7) the policies and decisions of the subsidiaries were determined by the parent's president; (8) one subsidiary received no profit; (9) one subsidiary was dissolved with its debt written off upon completion of a project; (10) the offices of all three corporations were at the same address; and (11) the correspondence from the parent revealed that it considered the subsidiary's project as its own.

*Precision, Inc. v. Kenco/Williams, Inc.*, 66 F. App'x 1, 5 (6th Cir. 2003) (citing *Herman*, 26 N.W.2d 757).  Similarly, in the same context, Michigan courts have examined whether the companies had "shared principal offices, . . . interlocking boards of directors or frequent interchanges of employees."  *Seasword*, 537 N.W.2d at 224 n.10.

There can be no dispute that Polestar Michigan and Polestar Florida were used as mere instrumentalities of each other and should be considered one and the same. *Kline*, 305 N.W.2d at 298.  Polestar Florida and Polestar Michigan were essentially "mere departments" of each other.  *Herman*, 26 N.W.2d at 762.  The companies shared offices, there was a frequent exchange of money between companies, there was a frequent interchange of employees, there was an interlocking payroll system, and there

was little capitalization of Polestar Florida. *Seasword*, 537 N.W.2d at 224 n.10; *Action Plumbing*, 118 N.W.2d at 958; *Herman*, 26 N.W.2d at 760.

Polestar Michigan performed much of the work for Polestar Florida. Most of Polestar's administrative work was performed at Polestar Michigan's office in Michigan. (Pl.'s Mot. Ex. A at 37.) Polestar Michigan's employees performed bookkeeping, answered telephone calls, performed information technology work, and made estimates for Polestar Florida. (*Id.* at 148.) Polestar Florida would then pay Polestar Michigan for these services, and the method of calculation for overhead was not based on actual work but instead on a percentage of sales. (*Id.* at 149.) In addition, Polestar Michigan employees performed work on Polestar Florida's projects, including one of the unsuccessful Florida condo conversion projects, 401 Blue. (*Id.* at 160.) Polestar Michigan would pay its employees to perform this work for Polestar Florida and then Polestar Florida would pay Polestar Michigan. (*Id.*) These facts can lead only to the conclusion that Polestar Florida and Polestar Michigan were mere instrumentalities of one another.

As in *Action Plumbing*, in this case "[t]here was a constant interchange of funds among the corporations without any care as to the corporate structure, and whenever the corporations got in great financial difficulty they were bailed out." 118 N.W.2d at 958. Plaintiff's Exhibit D provides evidence of hundreds of thousands of dollars that passed between the two entities. (Pl.'s Mot. Ex. D.) Banach was unsure how these transactions were documented and Defendants have not attached any documentation for these transactions. (Pl.'s Mot. Ex. A at 162.) Banach testified that the reason for the transfers was to "keep things afloat between both entities" and that "[b]oth entities

18

helped each other out in times of need." (*Id.* at 134, 155.) Money would shift back and forth to cover payroll expenses and taxes on an as needed basis. (*Id.* at 99, 155.) Also, Polestar Florida paid the legal expenses of Polestar Michigan, and Polestar Michigan paid the salaries of Banach and Gilbert, with Polestar Florida then paying a "management fee" to Polestar Michigan. (*Id.* at 103, 136, 139.)

Another factor that weighs in favor of piercing the corporate veil is that Polestar Florida had no initial capitalization. *Herman*, 26 N.W.2d at 760. Defendants argue that this is not uncommon for a start-up business, (Defs.' Resp. at 6-7), which may be true. However, throughout the operation of Polestar Florida, including after having realized more than $11 million in sales, the business never received adequate capitalization. The lack of capitalization weighs in favor of piercing the corporate veil.

This lack of capitalization also impacts another potential factor—the fact that there were additional members of the company. Typically, this would be evidence of a "check," preventing the operation of the entity by some members to serve interests unconnected with the other members. But when no member has any real personal stake in the entity, the weight of this factor is diminished. Rafferty and Morrison would not have a strong incentive to ensure that Polestar Florida was being operated solely for its own purposes and not for Polestar Michigan's purposes because they, like all of the members, simply did not have much, if any, financial exposure if the business failed.

Defendants assert that they observed corporate formalities by holding meetings, (Defs.' Resp. at 6), but the only evidence of meetings is from 2008, after Polestar Florida had essentially ceased operating. (Pl.'s Mot. Ex. E.) No meeting minutes from 2005, 2006, or 2007 have been produced. The existence of two after-the-fact meetings

does not carry much weight in terms of demonstrating that the corporate form of Polestar Florida was respected.

Defendants also claim there is a genuine dispute as to the loan documentation between the entities. (Defs.' Resp. at 12.) Evidence that one company "provides interest free loans without observing corporate formalities by documenting those loans with promissory notes" supports an alter ego finding. *Precision, Inc.,* 66 F. App'x at 5 (citing *Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174, 1188 (C.D. Cal. 1998)). However, Defendants did not include any evidence in their response which demonstrates a genuine issue as to the loan documentation. *See Int'l Millennium Consultants, Inc. v. Taycom Business Solutions, Inc.*, No. 08-CV-11303, 2010 WL 733087 (E.D. Mich. Mar. 1, 2010) (Borman, J.) ("[Defendant] could easily prove it simply by submitting relevant documentation such as loan papers, tax statements showing dividend distributions, W-2 forms, or the like. No such papers have been filed. As [plaintiff] notes, and the Court agrees, the absence of such crucial evidence in the face of the present motion is highly suggestive."). More fundamentally, though, even if the loans were documented, it would not alter the result in light of the other substantial evidence that Polestar Michigan and Polestar Florida were mere instrumentalities of each other.

Based on the undisputed facts, a reasonable factfinder could conclude only that Polestar Florida and Polestar Michigan were mere instrumentalities of each other. Polestar Michigan therefore cannot insulate its assets from the creditors of Polestar Florida. Although Banach stated that they were "trying to keep a heart beat in both," (Pl.'s Mot. Ex. A at 136), there was only one circulatory system, with the money from each entity serving as the lifeblood for the other.

20

With respect to Four Star Holdings and Yukon Holdings, Plaintiff has not established that a reasonable factfinder must conclude that these entities were mere instrumentalities of Polestar Florida. Unlike the situation with Polestar Michigan, there was no shuffling of money back and forth between the companies—Polestar Florida made one loan to Four Star Holdings and one loan to Yukon Holdings. A related company making loans to another related company does not necessarily mean that the companies are instrumentalities of each other. *Precision, Inc.*, 66 F. App'x at 5. A reasonable factfinder could find this evidence sufficient to make a finding of mere instrumentality, particularly because of the apparent lack of business purpose for the loan to Yukon Holdings. However, at the summary judgment stage and drawing all inferences from the facts in the light most favorable to Defendants, Plaintiff has not established that a reasonable factfinder would be required to reach this conclusion.

Nor has Plaintiff established that Aaron Banach Enterprises, Inc. should be held lilable for Polestar Florida's debts. The record is devoid of any evidence regarding this entity.

In addition, Plaintiff has not established that a reasonable factfinder would be required to find the individual Defendants liable. Indeed, Plaintiff submits no evidence regarding Anita Banach and Amy Gilbert's role in the operation of these companies, besides asserting that their names were listed on the deed to the house purchased in Stuart, Florida. (Compl. ¶ 46; Pl.'s Mot. Br. at 18.) This fact, by itself, cannot establish that these wives must be held liable for Polestar Florida's debts. As to the individual members of Polestar Florida, Plaintiff has not established what specific roles they played, if any, in operating the company; the only evidence put forward by Plaintiff in

this regard consists of general allegations from Rafferty and Morrison. (Pl.'s Mot. Ex. C.) Indeed, almost all of the evidence derives from Banach's deposition, and Plaintiff makes no specific assertions about Gilbert.

Plaintiff argues that these two individuals received excessive compensation. (Pl.'s Mot. Br. at 17.) In 2005, Polestar Florida's executive compensation was $194,000, split between four people, and Polestar Michigan's executive compensation was $258,858. (Pl.'s Mot. Ex. A at 87-88, 132.) These amounts may be proven to have been excessive; however, Plaintiff presents no evidence of what the market rate would have been for comparable work, and the court will not speculate. The court will therefore deny summary judgment as to Yukon Holdings, LLC, Four Star Holdings, LLC, Aaron Banach Enterprises, Inc., Aaron Banach, Anita Banach, Daniel Gilbert, and Amy Gilbert.

## B. Fraud or Wrong

Plaintiff argues that "Banach and Gilbert intentionally ignored the corporate form, not out of sloppiness, but in order to skirt liability and defraud creditors." (Pl.'s Mot. Br. at 18.) Defendants argue that Polestar Florida's inability to pay Plaintiff is not based on a wrong committed by Defendants, but instead is based on the bad economy. (Defs.' Resp. at 7.) Defendants focus on the elements of fraud and argue that they were not attempting to defraud Plaintiff. (*Id.* at 8.) In its reply, Plaintiff alleges that Defendants are attempting to elevate the second prong into a fraud requirement, which is not required. (Pl.'s Reply at 4.)

"Regarding the element of a wrong, any illegality would suffice to establish this element. In fact, even conduct short of the illegal could support element two. Michigan

law does not require a showing of fraud or illegality before the corporate form will be disregarded." *Mich. Laborers' Health Care Fund v. Taddie Const., Inc.*, 119 F. Supp. 2d 698, 703 (E.D. Mich. 2000). Indeed, "a breach of contract can satisfy this prong of the test." *Rogel v. Dubrinsky*, 337 F. App'x 465, 470 (6th Cir. 2009). However, "the injustice sought to be prevented must in some manner relate to a misuse of the corporate form short of fraud or illegality." *Soloman v. Western Hills Development Co.*, 312 N.W.2d 428, 432 (Mich. Ct. App. 1981).

Plaintiff has not established here that Defendants engaged in fraudulent behavior. Also, Defendants have not committed a wrong by entering into a failed project and falling upon hard economic times. Nor have Defendants committed a wrong by preferring some creditors over others after having fallen upon these hard economic times. *See Olympic Forest Products, Ltd v. Cooper*, 148 F. App'x 260, 264 (6th Cir. 2005). However, Polestar Florida has breached a contract to Plaintiff, and it has acknowledged this breach by agreeing to a consent judgment in the previous case. A breach of contract is sufficient to justify piercing the corporate veil. *See Rogel*, 337 F. App'x at 470.

The issue then becomes whether this breach somehow relates to Defendants' misuse of the corporate form. There can be no dispute that it does. The amount of money going back and forth between Polestar Florida and Polestar Michigan was substantial, particularly when compared to the amount owed to Plaintiff. In one month alone, an amount almost equal to what Plaintiff was owed was transferred from Polestar Florida to Polestar Michigan. (Pl.'s Mot. Ex. A at 152, 154.) This money could have been used to pay the legitimate obligations of Polestar Florida's third-party creditors.

23

Instead, it was being used to maintain the "heart beat" of Polestar Michigan. (See Pl.'s Mot. Ex. A at 136.)

It is relevant that Plaintiff is a sophisticated entity that voluntarily entered into a contractual relationship with Polestar Florida. *Cf. Rogel*, 337 F. App'x at 470; *Servo Kinetics, Inc.*, 475 F.3d at 800. Plaintiff had an obligation to perform some degree of due diligence on the company it was insuring before entering into a contract worth hundreds of thousands of dollars. Plaintiff also could have better protected itself by obtaining a personal guaranty from the individual members, as other creditors did. However, Plaintiff was "entitled to rely on the assumption that [Polestar Florida] would . . . be operated for the benefit of the entity." *Servo Kinetics, Inc.*, 475 F.3d at 800. Plaintiff "undertook the risks of contracting with an independent [Polestar Florida]; it did not voluntarily agree to limit its remedies for breach of contract to a corporation operated as a mere instrumentality of [other corporations]." *Id.*

Plaintiff contracted with Polestar Florida, not Polestar Michigan. It was entitled to assume that Polestar Florida's work would be performed by Polestar Florida employees, and that Polestar Florida's money would be used for Polestar Florida's purposes. Because it was not, Polestar Florida's creditors stood to lose. Polestar Florida was free to funnel money to Polestar Michigan. However, by doing so, when Polestar Florida's legitimate obligations to third parties became impossible to meet, Polestar Florida creates the risk that Polestar Michigan may be held responsible. Based on the undisputed facts of this case and viewing them in the light most favorable to Defendants, a reasonable factfinder must conclude that the disregard of the corporate

24

distinction between Polestar Florida and Polestar Michigan is related to the wrong in this case—Polestar Florida's breach of the insurance contract with Plaintiff.

## C. Unjust Loss

Plaintiff argues that it is unable to collect the judgment in the amount of $231,018 against Polestar Florida because "Banach and Gilbert intentionally undercapitalized Polestar Florida, funneled hundreds of thousands of dollars out from Polestar Florida, and played a shell game with the rest of Polestar Florida's assets." (Pl.'s Mot. Br. at 19.) Defendants argue that Plaintiff's loss "could not result from the alleged improper use of the corporate form," because even if Polestar Florida continued to operate, Plaintiff could not collect based on the priority of other secured creditors. (Defs.' Resp. at 11.) Defendants argues that Polestar Florida's inability to pay is the result of the economy and there is no evidence that they ceased operations to avoid paying Plaintiff. (*Id.* at 11-12.)

It is perhaps true that Polestar Florida's demise was chiefly the result of entering the real estate market in Florida at an inopportune time. There is no evidence that Polestar Florida ceased operations in order to avoid paying creditors. However, this does not necessarily mean that its prior actions did not cause an unjust loss to Plaintiff. As the Michigan Court of Appeals explained,

> We recognize that there is no evidence revealing, nor any finding by the trial court, that defendant set out *deliberately* either to wrong creditors or to avoid any legal obligations. Nevertheless, the trial court found that a wrong had been committed by defendant's "'flexible' approach to the corporation's distinct existence [which] had the foreseeable effect of perpetrating a wrong resulting in unjust loss to [plaintiffs]. . . . We cannot conclude that these findings were clearly erroneous.

*Daymon v. Fuhrman*, No. 249007, 2004 WL 2238596 (Mich. Ct. App. Oct. 5, 2004) (per curiam) (emphasis and alteration in original).

Here, there was more than a "flexible approach" to the distinct existence of Polestar Florida and Polestar Michigan. When Polestar Florida was in operation, it operated its business in a manner that made it virtually indistinguishable from Polestar Michigan. The foreseeable effect of the operation of a business in this regard is that third-party creditors would suffer if the business eventually went bad. The money that was going to pay Polestar Michigan's payroll expenses, taxes, legal fees, and other expenses should have been going to pay the legitimate obligations of Polestar Florida, including the insurance premiums due to Plaintiff. There is no dispute that Polestar Florida owes Plaintiff $231,018, and that it has suffered an unjust loss as a result of not being able to collect. Defendants' unsupported assertion that other secured creditors have priority does not alter the result. It has put forward no evidence. Accordingly, summary judgment will be entered in favor of Plaintiff as to Polestar Michigan.

## IV. CONCLUSION

A reasonable factfinder must conclude that the equities weigh against respecting the corporate formalities of judgment-proof Polestar Florida with respect to Polestar Michigan.

Accordingly, IT IS ORDERED that Plaintiff's motion for summary judgment [Dkt. # 29] is GRANTED IN PART and DENIED IN PART. It is GRANTED as to Polestar Construction of Michigan, LLC, Polestar Construction, LLC, and Polestar Construction of Florida, LLC. It is DENIED as to Aaron Banach Enterprises, Inc., Yukon Holdings,

LLC, Four Star Holdings, LLC, Aaron Banach, Anita Banach, Daniel Gilbert, and Amy

Gilbert.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  May 27, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 27, 2010, by electronic and/or ordinary mail.

s/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522